OPINION
{¶ 1} Defendant-appellant Benzell Ward appeals from his conviction and sentence for Trafficking in Cocaine. He contends that his conviction is against the manifest weight of the evidence; that his motion for judgment of acquittal should have been granted, or, alternatively, that his trial counsel was ineffective in having argued the motion, because the State failed to prove that the offense occurred within the time frame specified by the indictment; that the trial court erred by permitting testimony, over objection, from an undercover police officer that Ward's confederate told Ward, in the officer's presence, that the officer wanted to buy crack cocaine; and that the trial court erred by not imposing a minimum sentence.
{¶ 2} We conclude that Ward's conviction is not against the manifest weight of the evidence. We conclude that the evidence in the record is sufficient to establish that the transaction took place on June 1, 2001, notwithstanding the fact that the prosecutor mistakenly referred to the transaction, in one question, as having occurred on June 1, 2000, so that there was no basis for a judgment of acquittal upon the ground that the State failed to prove that the offense occurred within the time frame specified in the indictment. We conclude that the trial court properly overruled an objection to the undercover police officer's testimony concerning the statement made by Ward's confederate, to Ward, since it was not offered to prove the truth thereof, but merely to prove that the statement was made. Finally, we conclude that any error in having failed to impose a minimum sentence is moot, in view of the fact that Ward has already completed serving the sentence that was imposed. Accordingly, the judgment of the trial court is Affirmed.
 I
{¶ 3} Ward was charged by indictment with having aided or abetted David Gibson in committing the offense of Trafficking in Cocaine. Following a jury trial, he was convicted, and sentenced to a term of imprisonment of seven months, to be served concurrently with a sentence imposed in another case. From his conviction and sentence, Ward appeals.
 II
{¶ 4} Ward's First Assignment of Error is as follows:
{¶ 5} "WHETHER THE TRIAL COURT ERRED TO THE APPELLANT'S DETRIMENT WHEN IT ENTERED A GUILTY VERDICT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
{¶ 6} Dayton police officers decided to conduct a "buy-bust operation" at a source of suspected illegal drug activity on 23 Catherine Street. The operation began at about 12:40 p.m. on June 1, 2001.
{¶ 7} Dayton police detective Mark Stapleton, undercover, drove past the location, and made eye contact with a man standing on the porch, later identified as David Gibson. Stapleton testified concerning subsequent events, as follows:
{¶ 8} "Q. Did Mr. Gibson make contact with you at that point?
{¶ 9} "A. Actually, we have eye contact again. I pulled up and kind of yelled out my window, `Is anything going on?' Common street term for, you know, is there any drugs being sold, things of that nature. He actually was looking at me, and he kept looking behind me; and at that point I noticed in the rear that some of the business owners had kind of walked out kind of staring at us. So he motioned for me to pull back around front onto the street. So I did that.
{¶ 10} "Q. And when you did so, did you make contact with him?
{¶ 11} "A. Yes, he basically came up to my car, asked me what was going on as he opened my passenger door, got inside.
{¶ 12} "Q. So he got into your vehicle at that point?
{¶ 13} "A. Yes, sir. He did.
{¶ 14} "Q. And is it fair to say you had some conversation with him while you drove around?
{¶ 15} "A. Yes.
{¶ 16} "Q. Where were you driving around when you had this conversation with Mr. Gibson?
{¶ 17} "A. Actually, he directed me to pull off, and I went down Catherine to like a small alleyway here that comes out next to BHA Appliances, and basically had me go down Patterson and loop back around and up South Main Street to Apple. We basically just looped around the block while he questioned me.
{¶ 18} "Q. At some point after he had questioned you did you go to a different location?
{¶ 19} "A. Yes, we did.
{¶ 20} "Q. And what location did you then go to?
{¶ 21} "A. Actually, we were traveling back down South Patterson Blvd., and he directed me to pull into the lot of — that was on the other side where I had initially seen him. We pulled into the parking lot and stopped, and he got out of the vehicle and walked south through the lot to Mr. Ward, made contact with him.
{¶ 22} "Q. I'll have you stop right there in that area. What kind of people could you see in that area?
{¶ 23} "A. There was — there was probably about eight people in this large parking lot. There's actually the building whose parking lot we were in is — pardon me. I forget the name of the agency, but it's a social service agency.
{¶ 24} "Q. And when you stopped the vehicle, Mr. Gibson got out of your car and approached the particular individual?
{¶ 25} "A. Yes, sir.
{¶ 26} "Q. The individual that Mr. Gibson approached, do you see him in court today?
{¶ 27} "A. Yes, I do."
{¶ 28} Whereupon, Stapleton identified Ward.
{¶ 29} Stapleton's testimony then continued, as follows:
{¶ 30} "Q. When Mr. Gibson approached Mr. Ward, could you observe what transpired?
{¶ 31} "A. I couldn't hear what was said. I could tell that they briefly spoke. Mr. Gibson motioned back toward my vehicle. Mr. Ward looked at me inside my vehicle.
{¶ 32} "Q. Then what happened?
{¶ 33} "A. Mr. Ward got up — he was actually seated on like a bench — got up. Both individuals walked back over to my vehicle at that time.
{¶ 34} "Q. And when they walked over to your vehicle at that time, what occurred at that time?
{¶ 35} ". . . .
{¶ 36} "Q. Mr. Gibson had made a statement to you?
{¶ 37} "A. Yes, he did.
{¶ 38} "Q. After he made a statement, what occurred then?
{¶ 39} "A. Mr. Ward climbed in and began asking his questions as well as far as who was I, where was I from, what was I doing there, who did I come there previously with, basically things like that trying to feel me out.
{¶ 40} "Q. Did he ask you these questions on one occasion or more than one occasion?
{¶ 41} "A. More than one occasion.
{¶ 42} "Q. How many times did he go through these questions?
{¶ 43} "A. Well, while they was standing outside my vehicle, say, one round of these questions, but both individuals without any provocation got in my vehicle, Mr. Gibson in the front passenger seat, Mr. Ward in my rear passenger seat.
{¶ 44} "Q Q. Did Mr. Gibson ask you any questions?
{¶ 45} "A. Yes. They both basically took turns asking basically the same line of questioning.
{¶ 46} "Q. Was this before or after they got in your car?
{¶ 47} "A. They did it before as well as after they entered my vehicle.
{¶ 48} "Q. Did you ask or tell them to get in your car?
{¶ 49} "A. No, I did not.
{¶ 50} "Q. Did they ask to get in your car?
{¶ 51} "A. No, sir.
{¶ 52} ". . . .
{¶ 53} "Q. Okay. After the two of them got in your vehicle, what occurred after that?
{¶ 54} "A. Basically, the same thing as when Mr. Gibson was in the vehicle. We drove around the block a couple times while Mr. Ward as well as the other individual asked me, you know, `Are you a cop? What are you doing over here? How'd you come over here?' Same line of questioning that I had been asked before.
{¶ 55} "Q. Do you recall what you told them in response to these questions?
{¶ 56} "A. Of course, I told them that I wasn't a cop. I told them that I came over there about a week prior with a female named Kim. They asked me to describe her. I think I said she was a white female, blonde, five-three, 100 pounds. I told them I was from Moraine and, you know, of course, they knew I was there to purchase a forty.
{¶ 57} "Q. How did they know that?
{¶ 58} "A. I had expressed that to Mr. Gibson, and that was subsequently relayed to Mr. Ward.
{¶ 59} "Q. When was that relayed to Mr. Ward?
{¶ 60} "A. When we stopped in the parking lot and picked up Mr. Ward.
{¶ 61} "Q. Did you tell that to Mr. Ward or Mr. Gibson tell that to Mr. Ward?
{¶ 62} "A. Mr. Gibson did.
{¶ 63} "MR. REZABEK: [representing Ward] Objection, Your Honor; move to strike.
{¶ 64} "THE COURT: I'm sorry. What was the sequence again? Let's go to side-bar here."
{¶ 65} Whereupon, after a side-bar conference, the objection was sustained.
{¶ 66} Gibson told Stapleton to pull into a small alleyway and park. Gibson then got out of the car, but Ward remained in the car. Stapleton's testimony then continues as follows:
{¶ 67} "Q. During that five minute gap, what did Mr. Ward do?
{¶ 68} "A. He remained seated in the back seat of my car, and we basically had casual conversation.
{¶ 69} "Q. What did you talk with Mr. Ward about?
{¶ 70} "A. Actually, there were a couple of cruisers, marked cruisers, that went down the street, and he remarked that things were `hot' and that he didn't mess around with people that he didn't know.
{¶ 71} "Q. What occurred — Let me back up a second. Before you and — before you went to that address, pulled over as you were directed, did Mr. Gibson ask a question of Mr. Ward?
{¶ 72} "A. Yes, he did.
{¶ 73} "Q. And what question was that?
{¶ 74} ". . . .
{¶ 75} "He asked Mr. Ward what he thought.
{¶ 76} "Q. Okay, and what did Mr. Ward say in response to that question?
{¶ 77} "A. He told him, `It's up to you.'
{¶ 78} ". . . . .
{¶ 79} "Q. And when Mr. Gibson returned, did you and Mr. Gibson complete a transaction?
{¶ 80} "A. Yes, we did.
{¶ 81} "Q. And what transaction did you complete?
{¶ 82} "A. He was given forty dollars in exchange for an amount of crack cocaine."
{¶ 83} Not long after this, Stapleton gave a signal, and other police officers performed a traffic stop and arrested Gibson and Ward. The substance that Stapleton purchased was ultimately determined to be crack cocaine.
{¶ 84} Near the end of his direct testimony, Stapleton was asked about a statement that he heard Gibson make to Ward:
{¶ 85} "Q. When the two individuals were outside your car, did you hear Mr. Gibson make a statement to Mr. Ward?
{¶ 86} "A. Yes.
{¶ 87} "Q. What was that statement?
{¶ 88} ". . . .
{¶ 89} "A. The statement was that I was looking to get a forty-dollar or `a forty.'
{¶ 90} "Q. And is `a forty' — is that a street term?
{¶ 91} "A. Yes, it is.
{¶ 92} "Q. And what is that a street term for?
{¶ 93} "A. It refers to a forty-dollar amount of a particular drug like crack cocaine in this instance. A `twenty' refers to a twenty-dollar amount, a `dime' being a ten-dollar amount."
{¶ 94} Although mere association with a principal offender does not constitute aiding and abetting, the requisite criminal intent can be inferred from the presence, companionship and conduct of a defendant before and after commission of the offense. State v. Nievas (1987),121 Ohio App.3d 451. In the case before us, Ward's statements to Stapleton, and his communications with Gibson, support a reasonable inference that he knew what was going on, and was a willing participant in the drug transaction.
{¶ 95} Ward's First Assignment of Error is overruled.
 III
{¶ 96} Ward's Second Assignment of Error is as follows:
{¶ 97} "WHERE NO EVIDENCE WAS PRESENTED THAT THE ALLEGED OFFENSE OCCURRED WITHIN THE BRACKETED TIME FRAME SPECIFIED IN THE INDICTMENT THE QUESTIONS ARE WHETHER THE TRIAL COURT ERRED BY NOT GRANTING THE RULE 29 MOTION DISMISSING THE CHARGE AND WHETHER APPELLANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL DID NOT ASK FOR THE DISMISSAL BASED ON THE STATE'S NOT PROVING THAT THE ALLEGED OFFENSE OCCURRED DURING THE TIME SPECIFIED."
{¶ 98} In his testimony, Stapleton referred to the date of the transaction as June 1, 2001. When he packaged and marked the evidence, Stapleton wrote the date as "06-01-01." In one question, the prosecutor referred to the date of the events as June 1, 2000. If this was a misstatement by the prosecutor, and not an error on the part of the court reporter, Stapleton did not catch it.
{¶ 99} We are not impressed by this argument. The evidence in this case clearly establishes that the incident in question occurred on June 1, 2001. The prosecutor merely misspoke when he referred, in one question, to the date of the events as June 1, 2000. Ward's Second Assignment of Error is overruled.
 IV
{¶ 100} Ward's Third Assignment of Error is as follows:
{¶ 101} "WHETHER THE TRIAL COURT ERRED TO THE APPELLANT'S DETRIMENT BY OVERRULING THE OBJECTION OF APPELLANT WHEN THE STATE ASKED THE DETECTIVE TO STATE WHAT GIBSON, A PERSON OTHER THAN THE APPELLANT, HAD SAID TO THE APPELLANT REGARDING THE DRUG TRANSACTION."
{¶ 102} In this assignment of error, Ward contends that the statement Gibson made to Ward, in Stapleton's presence, that Stapleton "was looking to get a forty," was inadmissible hearsay. Hearsay is a statement, other than one made by the declarant while testifying at the trial, offered in evidence to prove the truth of the matter asserted. In this case, the significance of Gibson's statement to Ward was not the fact that Stapleton was seeking to purchase crack cocaine that fact was not in dispute. The significance was that Gibson shared his understanding of Stapleton's purpose with Ward. The mere fact that the statement was made, irrespective of its truth, tended to show that Ward was not an innocent bystander, but was a willing participant in a criminal enterprise, and that Gibson was sharing with Ward his understanding of the criminal nature of their enterprise.
{¶ 103} Gibson's statement to Ward was not hearsay, and the trial court did not err in overruling an objection based upon hearsay. Ward's Third Assignment of Error is overruled.
 V
{¶ 104} Ward's Fourth Assignment of Error is as follows:
{¶ 105} "WHETHER THE TRIAL COURT ERRED IN FAILING TO FOLLOW O.R.C. SECTION 2929.14 WHEN IT IMPOSED A SENTENCE GREATER THAN THE MINIMUM WHEN IT WAS THE APPELLANT'S FIRST PRISON SENTENCE, THE CRIME WAS NONVIOLENT, THE APPELLANT HAD ONLY A DRUG POSSESSION CHARGE MORE THAN THREE YEARS EARLIER FOR WHICH HE WAS IN THE TREATMENT IN LIEU OF CONVICTION PROGRAM, AND APPELLANT DID NOT HAVE AN EXTENSIVE HISTORY OF CRIMINAL BEHAVIOR."
{¶ 106} Ward was convicted and sentenced for Trafficking in Cocaine, a fifth degree felony. The prison term specified for fifth degree felonies is six, seven, eight, nine, ten, eleven, or twelve months. R.C. 2929.14(A)(5). The trial court imposed a sentence of seven months, to be served concurrently with a sentence in another case. Ward contends that the trial court erred when it imposed more than the minimum, six-month sentence.
{¶ 107} We agree with the State that this issue has become moot. Ward has served his seven-month prison term, and is not on post-release control. This issue does not affect the validity of Ward's conviction.
{¶ 108} Because this issue has become moot, Ward's Fourth Assignment of Error is overruled.
 VI
{¶ 109} All of Ward's assignments of error having been overruled, the judgment of the trial court is Affirmed.
YOUNG, J., concurs.